# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**GLORIA HANEY,**

       **Plaintiff,**

**v.**                                    **Civil Action No. 1:04CV185**
                                               **(Judge W. Craig Broadwater)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

       **Defendant.**

## OPINION/REPORT AND RECOMMENDATION

Plaintiff Gloria Haney brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I. Procedural History

Gloria Haney ("Plaintiff") filed an application for DIB on April 4, 2002, and protectively filed her SSI application on March 22, 2002 alleging disability since February 8, 1999, due to chronic low back pain, high blood pressure, glaucoma, and depression (R. 12, 51-53, 67, 155-58). The state agency denied Plaintiff's application initially and on reconsideration (R. 30-31, 159-67). Plaintiff requested a hearing, which Administrative Law Judge Barbara Gibbs ("ALJ") held on April 2, 2003, and at which Plaintiff, represented by counsel, Regina L. Carpenter, Esquire, and Lawrence

Ostrowski, Vocational Expert ("VE"), testified (R. 168-228). On June 23, 2003, the ALJ entered a decision finding Plaintiff was not disabled and could perform her previous relevant work as a general clerk and a number of light jobs identified by the VE (R. 11-19). Subsequent to the ALJ's finding, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6).

## II. Statement of Facts

Plaintiff was born on November 4, 1948, and she was fifty-four (54) years old on the date of the administrative hearing (R. 175). Plaintiff is a high school graduate and attended Computer Tech from 1987 to 1988, where she received special job training (R. 73, 176). She had worked from April, 1990, to September, 1997, as an office assistant and from August, 1990, to August, 1991, as a general clerk. Both jobs were classified as light and unskilled work (R. 68, 221). At the administrative hearing, the VE testified that Plaintiff had no skills that would transfer to other work (R. 221).

On February 8, 1999, Plaintiff claimed she experienced low back pain as she performed house-cleaning chores and reported to Marion Health Care Hospital, located in Fairmont, West Virginia. Plaintiff stated she had experienced no previous back problems, but that her current condition had be ongoing for five (5) days and worsened during the course of the day "after cleaning house." The doctor prescribed 20 Hydrocodone, one (1) every six (6) hours, and instructed her to perform activities as tolerated (R. 93).

On February 16, 1999, Plaintiff returned to Marion Health Care Hospital and reported she had not "been doing much" and had felt "a little better." A physical examination of Plaintiff revealed her range of motion was fair and she could complete a heel/toe stand. Plaintiff was

2

instructed to continue her activities as she could tolerate them, treat her back pain with heat, and return if she did not feel better (R. 92).

On February 19, 1999, Plaintiff reported to Morgantown Health Right for refills of her medication. She stated she had hurt her back on February 4, 1999, as she picked up a child. As treatment for that back injury, Plaintiff stated she had been "using a back massager, cold pack, & exercise" (R. 123).

On February 23, 1999, Plaintiff visited Morgantown Health Right, at which time she complained of low back pain and depression. She stated she had "been doing well [with] no . . . complaints [at] this time." Her blood pressure was "well controlled" and she was instructed to continue her current medications for that; her cholesterol was 229. Refills for Hydrochlorothiazide 25mg, Amitriptyline 25mg, and Verelan 240mg were provided (R. 122). On March 24, 1999, Plaintiff's prescriptions for Verelan 240mg, Amitriptyline 25mg, Hydrochlorothiazide 25mg, Apap 325mg, Premarin .625mg, and Provera 2.5mg were renewed at Morgantown Health Right (R. 120-21).

On March 28, 2000, Plaintiff visited Morgantown Health Right and reported she was "feeling pretty good" (R. 108). On September 19, 2000, Plaintiff visited Morgantown Health Right and reported she was "feeling pretty good today" (R. 106).

On April 20, 2001, Plaintiff visited Morgantown Health Right for a medical evaluation. She had no medical complaints and received prescriptions for Accupril 10mg and Estradiol 1mg (R. 105).

On March 8, 2002, Plaintiff returned to Morgantown Health Right to obtain refills of her prescription medications and with complaints of back pain. She stated her "back [was] still painful,

3

but somewhat better than previous." She was prescribed over the counter NSAID's for her back and her need for an orthopedic referral was noted (R. 85).

On April 24, 2002, Plaintiff returned to Morgantown Health Right for a medical evaluation and refills for medications. She reported "[n]o new complaints." At that appointment, Plaintiff complained of lower back pain, which started in February, 1999, and stated she had had "x-rays but no more work up" involving that condition and was applying for Social Security disability. The examining physician noted she complained of "chronic back pain," which was "on palpation in paravertebral area of lumbo sacral area." The doctor noted good strength in Plaintiff's legs, patellar reflexes were +2, and a gait was normal. She presented no sensory deficits. The physician ordered a MRI of Plaintiff's lumbar spine and prescribed Ibuprofen, 400mg, every six (6) hours (R. 95-96).

On April 28, 2002, an MRI of Plaintiff's lumbosacral spine was performed and revealed the following: 1) preservation of normal vertebral body height and marrow signal throughout the lumbar spine; 2) no spondyolysis or spondylolisthesis; 3) mild loss of height at L5-S1 intervertebral disk; 4) rounded area at T1 and T2 within the T12 vertebral body, consistent with a small hemangioma; 5) congenitally narrowed spinal canal, especially at lower lumbar; 6) no disk bulge, herniation, neural foraminal encroachment, or central spinal canal stenosis at L1-L2 or L2-L3 levels; 7) facet joint hypertrophy, prominence of the ligamentum flavum, and moderate central spinal canal stenosis at L3-L4 level; 8) no focal disk bulge or herniation at L3-L4 levels; 9) facet joint hypertrophy, prominent ligamentum flavum, significant epidural fat, broad based disk bulge, central spinal canal stenosis, and small annular tear at L4-L5 levels; and 10) facet joint hypertrophy, prominent ligament flavum, significant epidural fat, congenitally narrowed spinal canal, and focal disk herniation with extrusion configuration at L5-S1 level. Jeffrey S. Carpenter, M.D., concluded the MRI confirmed

4

"[c]ongentially narrowed spinal canal combining with degenerative changes, as well as very prominent epidural fat, causing central spinal canal stenosis from the L3 to the S1 level. This canal stenosis is severe at the L4-L5 level. L5-S1 disk herniation, which causes moderate encroachment upon the left neural foramen" was also confirmed (R. 96-97).

On May 1, 2002, Plaintiff returned to Morgantown Health Right for a consultation with a physician about the results of the April 28, 2002, MRI. The physician noted a referral to a neurosurgeon (R. 94).

On June 28, 2002, Amos W. Wilkinson, M.D., performed a vision examination of Plaintiff. He found her distant vision, with correction, to be 20/25 and her near vision to be 20/20, with correction. He diagnosed Plaintiff with "ocular hypertension probable chronic" and "open angle glaucoma (R. 135).

On July 5, 2002, a state agency physician, Hugh M. Brown, M.D., completed a Physical Residual Functional Capacity Assessment (RFC) of Plaintiff (R. 138-46). He noted her primary diagnosis was lumbar disk disease with stenosis, her secondary diagnosis was glaucoma, and her other alleged impairment was hypertension. He found Plaintiff had the following exertional limitations: 1) occasionally lift and/or carry twenty (20) pounds; 2) frequently lift and/or carry ten (10) pounds; 3) stand and/or walk with normal breaks for a total of about six (6) hours in an eight (8) hour workday; 4) sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday; 5) and unlimited push and/or pull (R. 139). Dr. Brown found Plaintiff's postural functions, i.e., climbing, balancing, stooping, kneeling, crouching, and crawling, should be occasionally limited (R. 140). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 141-42). Plaintiff's environmental limitations were for avoiding

concentrated exposure to vibrations (R. 142). On August 16, 2002, a second state agency physician reviewed and concurred with Dr. Brown's assessment (R. 145)

On September 27, 2002, Plaintiff returned to Morgantown Health Right to have the prescriptions for all medications renewed. She presented with ear pain and back pain, but stated she had no new complaints. The physician noted Plaintiff had not gone to a neurosurgeon and refused a referral at that time (R. 150).

On March 3, 2003, Plaintiff visited Morgantown Health Right to obtain refills on her prescribed medications. She complained of chronic pain in her lower back with pain radiating down her left leg. The physician noted Plaintiff had refused the "recommended neurosurgery referral in the past," but now desired the referral. The doctor noted her MRI had shown "congenitally narrowed spinal canal with severe spinal stenosis at L4-L5 and disk herniation." Plaintiff's prescriptions were renewed and she was referred to neurosurgery (R. 153).

On March 24, 2003, it was noted at Morgantown Health Right that the neurosurgeon would not "accept referral until more current MRI done." A letter was sent to Plaintiff informing her of this situation (R. 152).

On April 23, 2003, an MRI of Plaintiff's lumbar spine was performed (R. 154). Dennis M. Burton, M.D., opined that "[d]egenerative change and bulging annuli is noted with acquired spinal stenosis at L4-5. Broad based central and left lateral herniated nucleus pulposus at L5-S1 (R. 154).

At the administrative hearing Plaintiff testified she woke up the morning of February 8, 1999, and could not get out of bed due to severe back pain. Plaintiff stated that February 8, 1999, was the first time she had experienced back pain and that she sought medical treatment for it on February 9, 1999 (R. 176). Plaintiff testified that she did "not remember any snap or lifting the previous day or anything like that." She stated she "never understood what – how I just woke up and I just

6

couldn't get up." Plaintiff testified she remembered no injury to her back that would cause the pain (R. 198). Plaintiff testified that the back pain was "constant" and traveled in a tingling fashion, down her legs (primarily left) and both arms (especially at night) (R. 206-07). Plaintiff stated her back pain had gotten worse "because of the arthritis" (R. 207).

Plaintiff testified that she visited Morgantown Health Right, usually one time per month, for her medical needs, and that she no longer sought medical treatment or care at Marion Health Care Hospital (R. 177-78). In reviewing the list of medications taken by Plaintiff, Plaintiff stated she took everything on the list as prescribed and that she suffered no side effects from any of the medications (R. 179).

As to Plaintiff's activities of daily living, she testified at the administrative hearing that she completely maintained her grooming and personal hygiene, which included bathing, applying make-up, washing hair, styling hair, and dressing, but which did not include shaving (R. 179-80). Plaintiff stated she helped with the cooking and cleaning in that she prepared simple foods for lunch, washed clothes, and cleaned the bathroom (R. 184-85). Plaintiff stated she shared dinner preparation, changing bed linen, and grocery shopping responsibilities with the person with whom she lived (R. 185-86). Plaintiff testified she drove a car to the market, to the doctor, and to visit her lawyer, which averaged out to approximately three (3) times per month (R. 193).

Plaintiff testified she watched television for one (1) hour per day and had little difficulty following the plots to soap operas and *Law and Order* episodes, sat on the back porch during the summer months, occasionally read mystery novels and magazines, received family members as visitors about four (4) or five (5) times per year and neighbors as visitors up to three (3) times per week, occasionally talked on the telephone, cared for houseplants, and decorated the trailer in which

7

she lived (R. 187-92). Plaintiff stated she belonged to the Veterans of Foreign Wars Auxiliary, but that she did not attend church (R. 192-93). Plaintiff testified she went to "town" about once a month for take-away food (R. 195).

At the administrative hearing, Plaintiff testified that she did not exercise. When asked by the ALJ if anyone suggested she perform some exercise, such as walking, stretching, or strength building exercises, Plaintiff replied, "I have a little exercise sheet, Dr. Chong gave me." She stated she seldom did the exercises because they hurt her back. As to walking as an exercise, Plaintiff stated, "no way. There's no way I could do it" (R. 192-93). Plaintiff responded, when asked by the ALJ how much she smokes, that she'd been "cutting down" to about one-half pack of cigarettes per day and that she planned to begin using the "patch" to stop smoking (R. 195).

Plaintiff testified that she had difficulty sleeping. She stated she usually retired at 9:00 p.m. or 10:00 p.m.; because of her back pain, she watched television for one (1) to four (4) hours to aide her in falling asleep; and she awoke up to three (3) times per night (R. 180-82). Plaintiff testified she awoke at 9:00 a.m. or 10:00 a.m. and usually achieved six (6) to seven (7) hours of restful sleep per night (R. 182). Plaintiff stated she took Amitriptyline to help her sleep (R. 182-83). As to resting during the day, Plaintiff stated she sat on an infrared heating pad, at least three (3) times per day, for up to fifteen (15) minutes per time. Plaintiff also testified she sat on the heating pad several times each evening (R. 183).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Gibbs made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(1) of the Social Security Act and was insured for benefits through December 31, 2001.

8

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, sit for about 6 hours in an 8-hour workday, stand and walk for about 6 hours in an 8-hour workday, alternate between sitting and standing at will, and push and pull as much as she can lift and carry. In addition, the claimant can occasionally climb, balance, stoop, kneel, crouch and crawl, and should avoid exposure to moving machinery and unprotected heights. Thus, the claimant has the residual capacity for a limited range of light work.

8. The claimant is able to perform her past relevant work as a general clerk (20 CFR §§ 404.1565 and 416.965).

9. Even if the claimant's residual functional capacity did not allow her to perform her past relevant work as a general clerk, there are other jobs that exist in significant numbers in the national economy that the claimant can perform, consistent with her residual functional capacity, age, education and work experience.

10. The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

11. The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

12. The claimant has a semi-skilled work background and not transferable skills (20 CFR §§ 404.1568 and 416.968).

13. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

14. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a mail clerk (51,300 jobs in the national economy and 39 locally), and interviewer (22,700 jobs in the national economy and 35 locally) and a pager/library (33,200 jobs in the national economy and 32 locally).

15. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(F)) (R. 17-18)

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The ALJ's credibility analysis is improper both procedurally and substantively under the requirements of 20 CFR 404.1529, SSR 96-7p, and *Craig*.

    A.  The ALJ failed to follow the required two-step procedure for determining the credibility of a claimant's testimony.

    B.  The ALJ's credibility analysis is not supported by substantial evidence.

2.  The credibility finding upon which the residual functional capacity is based is improper procedurally and, substantively, it is not supported by substantial evidence.

The Commissioner contends:

1.  Substantial evidence supports the ALJ's finding that Plaintiff could perform the light jobs identified by the vocational expert.

2.  The ALJ properly considered Plaintiff's subjective complaints in accordance with the two-step procedure for determining the credibility of her testimony.

3.  Substantial evidence supports the ALJ's finding as to Plaintiff's subjective complaints.

## C. Credibility

The Plaintiff contends the ALJ failed to follow the required two-step procedure for determining the credibility of Plaintiff's testimony. The Defendant contends the ALJ properly considered Plaintiff's subjective complaints in accordance with the two-step procedure for determining the credibility of her testimony.

The Fourth Circuit has developed the following two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

As stated above, the ALJ must first determine whether the medical evidence shows an impairment that could reasonably be expected to cause the symptoms alleged. Id. at 596. Plaintiff contends the ALJ failed to follow this two-step procedure. As noted in the decision, the ALJ found, at step two of the sequential evaluation, "the medical evidence indicates that the claimant has degenerative disc disease with degenerative changes and bulging annuli, with acquired spinal stenosis, at the L4-L5 disc level and broad based central and left lateral herniated nucleus pulposus, and glaucoma, impairments that are severe within the meaning of the Regulations . . . " (R. 13).

The Defendant argues: "The ALJ clearly referenced the above standard in her credibility analysis (Tr. 14-15). The fact that the ALJ did not specifically state that she found Plaintiff had impairments that could reasonably be expected to produce pain or other symptoms under the first

12

prong of the analysis is completely irrelevant, as the ALJ could not have conducted the second portion of the analysis without that finding." (Defendant's brief at 8-9). However, in *Craig*, the ALJ similarly identified severe impairments at step two of the sequential evaluation, yet the court found that his pain analysis was inadequate. 76 F.3d at 589. The court found that the ALJ failed to "expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges." Id. at 596. The court held that the ALJ must determine whether the objective evidence could reasonably be expected to produce "the actual pain, in the amount and degree, alleged by the claimant." Id. at 594.

In the instant case, the ALJ adequately evaluated the evidence of record and found, at step two of the sequential evaluation, that Plaintiff's "medical evidence indicates that the claimant has degenerative disc disease with degenerative changes and bulging annuli, with acquired spinal stenosis, at the L4-L5 disc level and broad based central and left lateral herniated nucleus pulposus, and glaucoma" (R. 13); however, the ALJ did not make a finding as to whether Plaintiff's severe impairments could reasonably be expected to produce the actual pain, in the amount and degree, she alleged. In *Craig*, the ALJ found severe impairments at step two of the sequential evaluation, yet the Fourth Circuit held that the identification of severe impairments was not an explicit step-one determination for purposes of the pain analysis. Therefore, the ALJ's finding in this case of "impairments that are severe within the meaning of the Regulations" does not constitute an adequate finding under the first step of the pain analysis (R. 13).

The undersigned notes there is a serious split within the Fourth Circuit regarding this issue. The Southern District of West Virginia has held that an ALJ "must expressly consider the threshold question" of whether the claimant has an impairment that could cause symptoms resulting in pain.

13

*Hill v. Commissioner*, 49 F. Supp. 2d 865 (S.D.W.Va. 1999). That court rejected the Commissioner's arguments that: 1) "the ALJ did in fact 'explicitly' perform a part 1 pain analysis by acknowledging that Claimant's impairments could and did in fact cause headaches and dizziness;" and 2) "the ALJ 'implicitly' performed a part 1 pain analysis by evaluating the actual functional limitations caused by Claimant's impairments." Id. at 868-869. Other district courts within the Fourth Circuit, however, have held that the ALJ did not err in failing to meet the first step of the two-step pain analysis under *Craig* if the ALJ 1) implicitly performed a part 1 pain analysis or 2) otherwise thoroughly evaluated both the objective evidence and the subjective complaints. *See*, e.g., *Pittman v. Massanari*, 141 F. Supp. 2d 601 (N.D.N.C. 2001), which states:

> The record contains evidence of Plaintiff's post-tibial fracture bony defect – a condition which *could* reasonably be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ **essentially** found that Plaintiff could satisfy the first prong of the test articulated in *Craig*. However, the ALJ evaluated the "intensity and persistence of his pain, and the extent to which it affects his ability to work," and essentially found Plaintiff's subjective description of his limitations not credible.

(Emphasis added). *See also Perkins v. Apfel*, 101 F.Supp.2d 365, 373 (D. Md. 2000), and *Ketcher v. Apfel*, 68 F.Supp.2d 629, 650-52 (D. Md. 1999). In *Ketcher*, the court found:

> Although the ALJ did not specifically state that the claimant's alleged pain could result from these medically determined impairments, it is clear that the ALJ made this determination since he noted that the impairments were "severe" and affected his functional capacity. Even if the ALJ failed to make an express finding at step one of the pain analysis, the ALJ correctly applied step two of the analysis.

Id. at 651 (internal citations omitted). In the instant case, the Defendant argues that "[s]ince the ALJ plainly completed the second portion of the analysis, her omission of such a specific statement under the first prong is harmless error . . . ." (Defendant's brief at 9). The undersigned disagrees. The Fourth Circuit in *Craig* imposed on the ALJ the duty to expressly state whether the objective evidence shows an impairment that could cause the claimant's claimed symptoms at step one of the

pain analysis. 76 F.3d at 596. Indeed, the *Craig* court held that "the ALJ's consideration of the medical evidence was more than adequate." 76 F.3d at 591. The court further found that the ALJ had reviewed all of the medical records "in painstaking detail." Id. at 592. Regardless of the ALJ's competent examination of the evidence, however, the court found his decision inadequate because he failed to address the threshold question in the pain analysis. The undersigned, therefore, finds the ALJ erred in failing to properly establish a threshold, at step-one of the pain analysis requirement, that Plaintiff's medically determinable impairments could cause the symptoms of which she complained.

The Plaintiff further contends the ALJ's credibility analysis is not supported by substantial evidence. The Defendant contends, however, that substantial evidence supports the ALJ's finding as to Plaintiff's subjective complaints. Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson, supra.* As noted, at the second step in the two-step pain analysis, the intensity and persistence of the Plaintiff's pain must be evaluated. To that end, the ALJ in the instant case considered Plaintiff's statements about her lower back impairment, laboratory findings, and medical signs.

96-7p provides as follows:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to

treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). . . . However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. . . .

It was, therefore, proper for the ALJ to note the following inconsistencies in Plaintiff's statements regarding her impairment.

The claimant is not entirely credible concerning the intensity, duration and limiting effects of the symptoms. Although progress notes from Marion Health Care on February 9, 1999, show that the claimant reported injuring her back while cleaning the house (Exhibit 1F/9), treatment notes from Morgantown Health Right on February 19, 1999, indicate the claimant reported hurting her back when picking up a child. (R. 15).

The ALJ expanded on Plaintiff's statements made at the administrative hearing by opining that Plaintiff was "very inconsistent in her testimony regarding the back pain. She testified that she woke up the morning before going to the doctor with back pain so severe that she could not get up. She stated that she had no explanation why the pain occurred" (R. 15). At the administrative hearing, Plaintiff testified, "I do not remember any snap or lifting the previous day or anything like that. I never understood what – how I just woke up and I just couldn't get up" (R. 198). This testimony contradicts Plaintiff's statement to Marion Health Care that she had injured her back cleaning house and her statement to Morgantown Health Right that she had injured her back lifting a child (R. 15, 93, 123). Additionally, as the record reveals, the ALJ discussed Plaintiff's lack of candor about her

prescribed treatment for her back pain by noting Plaintiff "did not report to Healty Right (sic) that she was given prescription pain medication by Marion Health Care but rather stated that she was using a back massager, cold pack, and exerciser to relieve her back pain. (Exhibit 2F/30)" (R. 15).

The ALJ opined the following: "These discrepancies in the claimant's versions of how she injured her back and her failure to reveal that she was prescribed medication for low back pain by Marion Health Care at the same time she was complaining of back pain to Wheeling Health Right (sic) raises doubts as to her overall credibility" (R. 15). The discrepancies and inconsistencies in Plaintiff's statements about how she injured her back and her treatment for and care of that injury are substantial evidence which support the ALJ's finding that Plaintiff was "not entirely credible" (R. 15).

In addition to Plaintiff's statements of pain, the ALJ discussed and considered the results of objective medical signs and laboratory testing. The ALJ observed that "[t]he record fails to establish objective evidence of a back impairment until an MRI was performed on April 28, 2002. X-rays taken on June 2, 1999, showed no significant bony abnormality . . . and indicated intact height contour of the bodies of the lumbar vertebrae and maintained disc spaces" (R. 13, 15). The April 2002 MRI revealed "congenitally narrowed spinal canal combined with degenerative changes, as well as very prominent epidural fat, [resulting] in central spinal canal stenosis from the L3 to S1 disc levels, with the stenosis being severe at the L4-L5 level. It also showed an L5-S1 disc herniation, which caused moderate encroachment upon the left neural foramen." During the April 24, 2002 examination for her back, however, Plaintiff "exhibited pain on palpation in the paravrebral area of the lumbosacral area," but her "patella reflexes were +2, her legs showed good strength, and she walked with normal gait. She had no sensory deficits" (R. 14). Even though Plaintiff testified her

17

back pain was so severe she could not shave her legs, slept poorly, could not vacuum, could not stand for longer than five (5) or ten (10) minutes, and could not exercise from the onset of her back injury of 1999, there was no medical test result for three (3) years to support a back impairment existed. Additionally, a 1999 examination and a 2002 examination of her back revealed normal function (R. 14, 95-96, 180, 182-83, 184, 189, 92). The absence of objective medical test and/or physical examination results which could support Plaintiff's complaints of a back impairment from 1999 to 2002 is substantial evidence on which the ALJ relied in conducting the credibility analysis.

Furthermore, the ALJ noted "the treatment notes from both clinics between late 1999 and early 2002 generally report the claimant is doing well" (R. 15). Those treatment notes reveal 1) on February 16, 1999, Plaintiff's range of motion was fair and she could complete a heel/toe stand at Marion Health Care; and 2) on April 24, 2002, Plaintiff's leg strength was good, patellar reflexes were +2, and a gait was normal. She presented no sensory deficits (R. 92, 94-95). Additionally, the ALJ noted Plaintiff's "reports of back pain from onset until after she had applied for Social Security disability benefits were reports of improvement" (R. 15). The ALJ noted Plaintiff stated "her back was better but still hurt" on July 1, 1999, and "her back was still painful but somewhat better than previously alleged" on March 8, 2002 (R. 13-14). The record of evidence also reveals that Plaintiff stated 1) she had "been doing well [with] no . . . complaints [at] this time" on February 23, 1999 (R. 122); she was "feeling pretty good" on March 28, 2000 (R. 106); and 3) she was "feeling pretty good today" on September 19, 2000 (R. 106). Both the physicians' treatment notes and Plaintiff's statements to the physicians about her improving back condition are substantial evidence which support the ALJ's finding that Plaintiff was "not entirely credible concerning the intensity, duration . . . of the symptoms" (R. 15).

18

The undersigned, therefore, finds the ALJ's credibility analysis at step two was "supported by substantial evidence . . . ." *Hays, supra.* The undersigned further finds the ALJ did not err in evaluating the discrepancies and inconsistencies of Plaintiff's testimony; the ALJ did not err in evaluating the objective medical test and/or physical examination results relative to Plaintiff's lower back impairment; and the ALJ did not err in evaluating the physicians' treatment notes and Plaintiff's statements made to the physicians about to her lower back condition.

### D. Residual Functional Capacity

The Plaintiff contends the ALJ's credibility finding upon which the residual functional capacity is improper procedurally and, substantively, not supported by substantial evidence. The Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff could perform the light jobs identified by the vocational expert.

20 CFR §§ 404.1545 and 416.945 define residual functional capacity as follows:

> Residual Functional Capacity is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of claimant's medical condition. Observations by treating physicians . . . or other persons of claimant's limitations may be used.

In her decision, the ALJ stated the following:

> I have found the claimant not entirely credible. Accordingly, the claimant's subjective allegations were given only limited weight in determining the residual functional capacity.
> As for the medical opinions, significant weight has been given to the July 2002 state agency medical consultant opinion that the claimant was capable of light work (Exhibit 4F), since it was supported by the medical findings as well as the limited treatment history. Moreover, I note that the record fails to show that any treating physician assessed the claimant with specific functional limitations.
> Accordingly, the undersigned finds the claimant retains the residual functional capacity perform light work with a sit/stand option that requires only occasional, non-repetitive postural activities and that does not require concentrated exposure to hazards (moving machinery and unprotected heights)" (R. 15).

19

The ALJ provided only limited weight to Plaintiff's complaints of pain because the ALJ had found Plaintiff to be not entirely credible (R. 15). As noted in the body of this Opinion/Report and Recommendation, even though the ALJ failed to properly establish a threshold, at step-one of the credibility analysis requirement, that Plaintiff's medically determinable impairments could cause the symptoms of which she complained, substantial evidence existed in the record and was correctly considered by the ALJ in at step two of the credibility analysis. The ALJ thoroughly and correctly considered Plaintiff's statements about her pain, the laboratory findings, and the medical signs to find Plaintiff not fully credible (R. 15). The ALJ was correct, then, in giving limited weight to Plaintiff when determining her RFC. Additionally, the ALJ's determination of Plaintiff's RFC was not based on her credibility analysis of Plaintiff alone, but also on the findings of the state agency physicians and the treating physicians (R. 15).

The ALJ considered and discussed the finding by the state agency physicians that Plaintiff was capable of performing light work (R. 138-45). The medical evidence which supported this determination was the April 24, 2002, record from Morgantown Health Right and the April 28, 2002, MRI (R. 140). In addition to the state agency finding, the ALJ considered the observations of the treating physicians. Except for instructing Plaintiff to continue her activities as she could tolerate them, the physician at Marion Health Care did not limit her exertional activities in 1999 (R. 85-93). The physicians who treated Plaintiff at Morgantown Health Right did not assess Plaintiff with any functional limitations (R. 94-133, 150-53). Providing "significant weight," therefore, to the opinions of the state agency physicians was correct on the part of he ALJ. The findings by the state agency physicians, combined with the absence of any exertional limitations imposed on Plaintiff by her treating physicians, is substantial. The undersigned, therefore, finds the ALJ did not err in

20

determining Plaintiff's residual functional capacity to be for light work because it was based on substantial evidence of the record.

## VI. RECOMMENDATION

For the reasons herein stated, the undersigned finds the ALJ's credibility analysis at step two is supported by substantial evidence; the ALJ's finding that Plaintiff could perform the light jobs identified by the VE is supported by substantial evidence; and the credibility analysis used by the ALJ to determine Plaintiff's residual functional capacity was proper and supported by substantial evidence; however, the undersigned finds the ALJ erred in conducting step one of the credibility analysis as mandated in *Craig v. Chater.* I, accordingly, recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __15__ day of April, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE